# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | CASE NO. 6:09-cr-135 |
| | § | |
| SCOTT ODELL WILLIS | § | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant Scott Willis's ("Defendant") motion to suppress certain physical evidence obtained during a search of his residence on August 10, 2009 (Doc. No. 17). Judge Schneider denied the motion without prejudice, finding Defendant's motion consisted only of conclusory allegations and lacked specific facts (Doc. No. 18). Defendant then moved for reconsideration and provided specific factual allegations (Doc. No. 19). The Government filed a response (Doc. No. 21). Judge Schneider referred the motion to the Court to propose findings of fact and recommendations as to disposition of the matter (Doc. No. 20). The Court heard argument on April 1 and April 5, 2010. Having considered the parties' submissions and argument, the Court recommends Defendant's motion be **GRANTED**.

## FACTS

On August 10, 2009, law enforcement officers sought to execute a felony arrest warrant for Jeremy Creson, a target of a methamphetamine distribution investigation. In the course of searching for Creson, officers ticketed Steve Willis, Defendant's brother, for possession of drug paraphernalia. Steve Willis asked if he would receive assistance resolving that ticket if he cooperated with law enforcement by providing the whereabouts of Creson. Officer Floyd Wingo told him that he could not guarantee a result but would try to help. APR. 1 HR'G TR. at 99. At approximately 1:45 p.m.,

Steve Willis phoned law enforcement to report Creson was hiding in a tool shed on Defendant's property. APR. 1 HR'G TR. at 85. As officers[1] converged at a staging area near the property to assemble their team and suit up, Officer Wingo asked Steve Willis to verify whether Creson was armed. Steve Willis returned to Defendant's shed, confirmed his belief Creson was unarmed, and relayed this to Officer Wingo.[2] Steve Willis declined Officer Wingo's request to physically lead them to the property and the shed, but remained on the phone with him until he had pulled into Defendant's driveway and identified the tool shed.

Defendant's residence is located on a two acre clearing at the end of a rural county road. A driveway extends from the end of the street toward Defendant's residence. A second driveway or parking area extends toward three additional trailers or sheds located near the residence. Steve Willis told officers Creson was hiding in the shed with a car port awning, set immediately south of the residence.

When officers arrived at approximately 2:15 p.m., APR. 1 HR'G TR. at 84-85, they parked their vehicles in the second driveway near the trailers and, with guns drawn, approached the shed identified as Creson's hiding place. Officer Wingo banged on the door of the shed and identified himself as law enforcement while Agent Keener looked in a shoulder-high window. Officer Wingo's knocks did not receive any response and Agent Keener did not observe anyone inside the

---

[1] Officer Terry Linder testified that, in addition to himself, Officer Wingo, Agent Ken Keener, Officer Chad Taylor, Deputy Tracy Freeman, Agent Stuart Nipper, and a Kilgore officer were involved in the apprehension of Creson. APR. 1 HR'G TR. at 86. Officer Linder, Officer Wingo, and Agent Keener testified at the evidentiary hearing.

[2] Officer Wingo stated he communicated Steve Willis's belief that Creson was unarmed and hiding in the shed to other officers. Some officers, however, may have not received this communication due perhaps to incompatible radio systems. *Compare* APR. 1 HR'G TR. at 53-56 (Officer Linder testifying the information had not bee communicated to him) *with* APR. 1 HR'G TR. at 122 (Officer Wingo testifying he shared the information via his DEA radio and that not all vehicles had DEA radios).

shed.

Officers, believing Creson may have fled the shed to another building on the property, then proceeded to the residence. APR. 1 HR'G TR. at 104-05. Two officers approached the front of the residence, knocked on the door, and received no response. The officers tried the door knob but did not enter when they found it locked. Officer Wingo and Agent Keener went to the rear of the residence, where a vehicle matching the description of the vehicle said to be in Creson's possession was parked, knocked on the rear door, and also received no response. The officers then tried the rear door's knob, found it unlocked, and entered the residence. The officers performed a protective sweep, quickly searching areas of the residence where a person could hide. During the sweep, Officer Wingo observed in plain view a digital scale and marijuana residue.

After determining no one was in the residence, the officers exited and rejoined the rest of the team, which had assembled in the parking area to discuss their next step. While the officers huddled, Agent Keener double checked the shed's window and found Matt Willis, Defendant's son, attempting to crawl underneath a table. As Agent Keener yelled at Matt Willis to raise his hands, other officers surrounded the shed and ordered the occupants out. Officers secured Matt Willis, Creson, and a third individual as they exited.

Officer Linder then prepared an affidavit and search warrant for buildings and vehicles on Defendant's property. As a basis for probable cause, Officer Linder recounted the events of the day as officers sought to apprehend Creson. Officer Linder explained:

> Agents knocked at the rear door [of Defendant's] residence and received no answer. Due to having a felony warrant for Creson and information that Creson was at the residence, agents attempted to open the rear door of the residence and found it to be unlocked. TFO Floyd Wingo, TFO Chad Taylor, and ATF Agent Ken Keener entered

3

> the residence to conduct a sweep for Jeremy Creson. Agents located no persons within the residence, however TFO Wingo observed a digital scale and a small quantity of marijuana in the bedroom on the southern most side of the residence.

(Doc. No. 22-1 at 3).

A magistrate signed the warrant at 4:24 p.m., approximately two hours after officers had arrived at Defendant's property. During a search pursuant to this warrant, officers seized a quantity of marijuana and nearly three dozen firearms. Defendant was indicted and arrested for possession with intent to distribute marijuana; maintaining a place for the manufacture, distribution, and use of marijuana; possession of a firearm during and in furtherance of a drug trafficking crime; and, possession of a firearm by a drug user.

## **PARTIES' CONTENTIONS**

Defendant argues the only probable cause for the warrant to search his residence was Officer Wingo's observation of digital scales and marijuana residue. Defendant further argues this observation was the product of an unreasonable, warrantless search and all subsequently seized evidence was fruit of the poisonous tree. Defendant moves the Court to suppress any and all evidence seized in connection with these searches.

The Government does not dispute the initial sweep of Defendant's residence was a warrantless search, but argues the search was justified by exigent circumstances. The Government argues Creson was a dangerous fugitive who had twice evaded police, was known to carry a weapon, and who had told others he would do whatever was necessary to avoid prison. The Government contends Creson posed a flight risk and a threat to officer safety, justifying the warrantless entry into Defendant's residence to search for Creson.

4

## **LEGAL STANDARD**

Absent consent or exigent circumstances, law enforcement must obtain a search warrant before searching a third-party's home for the subject of an arrest warrant. *Steagald v. United States*, 451 U.S. 204, 216 (1981); *see also United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (en banc) ("Although a warrantless entry into a home is presumptively unreasonable, entry may be justified by exigent circumstances"). "In order to enter a person's residence, even under exigent circumstances, law enforcement first must have probable cause that contraband is inside or that an illegal act is taking place." *United States v. Newman*, 472 F.3d 233, 236 (5th Cir. 2006).

"The exigent circumstances exception applies 'where the societal costs of obtaining a warrant, such as a danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.'" *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009) (quoting *United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993)). "[T]here is no set formula for determining when exigent circumstances may justify a warrantless entry." *Blount*, 123 F.3d at 837. A non-exhaustive list of factors that may be considered includes: 1) the degree of urgency and the time necessary to obtain a warrant; 2) the belief contraband is about to be removed; 3) the possibility of danger to officers guarding the site while a search warrant is sought; 4) information indicating the possessors of the contraband are aware the officers are coming; and 5) the destructibility of the contraband. *Id.*; *see also Newman*, 472 F.3d at 237 ("We have before held the possibility that evidence will be removed or destroyed, the pursuit of a suspect, and immediate safety risks to officers and others are exigent circumstances that may excuse an otherwise unconstitutional intrusion into a residence"). If the officers' belief was reasonable, the Court should not second-guess their judgment. *Blount*, 123 F.3d at 838.

"[T]he prosecution may not rely upon an exigency that the police themselves created through unreasonable investigatory tactics." *Id.* "Although there is no question that the deliberate creation of urgent circumstances is unacceptable, bad faith is not required to run afoul of the Fourth Amendment." *United States v. Rico*, 51 F.3d 495, 502 (5th Cir. 1995). In determining whether the exigent circumstances were manufactured, the Court first considers whether the officers "could have obtained a search warrant prior to the development of the exigent circumstances upon which they relied." *Id.* Even if the Court determines the officers could not have obtained a search warrant, officers may be responsible for manufacturing exigent circumstances if they use unreasonable law enforcement tactics. *Id.*

## DISCUSSION

Although the point was not disputed, the Court must first decide whether the officers had a reasonable belief Creson was inside Defendant's residence. *Newman*, 472 F.3d at 236 ("In order to enter a person's residence, even under exigent circumstances, law enforcement first must have probable cause . . ."). Officer Wingo testified that Steve Willis had informed them Creson was hiding in a shed at Defendant's property. APR. 1 HR'G TR. at 99-100. Steve Willis had confirmed Creson's location moments before the officers arrived on the scene. Initially, officers did not find Creson or anyone else hiding in the shed, but officers observed a vehicle matching the vehicle Creson was suspected to be driving parked a short distance away from the shed at the rear of the residence. Upon these facts, the Court finds the officers belief reasonable.

The Court now turns to whether exigent circumstances existed to justify the officers' warrantless search of the residence. *Steagald*, 451 U.S. at 216. The officers in this case testified that they went to Defendant's property with the intention of investigating Steve Willis's tip and detaining

6

Creson if he was found. APR. 1 HR'G TR. at 86-87. From the officers' testimony, the Court concludes the officers were essentially executing an investigatory tactic known as a "knock and talk."[3] The questions for the Court are whether exigent circumstances existed and, if so, whether they were caused by the actions of the officers.

The Court finds instructive several Fifth Circuit decisions that involved officers approaching a residence and subsequently conducting a warrantless search. The Court will briefly summarize these cases.

In three cases, *United States v. Rico*, *United States v. Watson*, and *United States v. Maldonado*, officers did not employ a knock and talk but exigent circumstances arose that prompted officers to approach a residence. Each of these cases involved officers discontinuing surveillance to react to exigent circumstances created by suspects. The officers did not conspicuously approach the house until a suspect's action or conduct necessitated it to prevent the destruction of evidence or to preserve the safety of the officers.

In *Rico*, officers were investigating a cocaine trafficking organization. 51 F.3d at 497. Responding to a cooperating witness's tip, officers monitored persons and vehicles suspected of transporting cocaine. *Id.* at 497-98. This surveillance led the officers to two residences located less than a mile apart. *Id.* at 498. The officers' investigation produced probable cause to obtain a search warrant for the first residence, but not the second. *Id.* The officers executed the search warrant for

---

[3] A knock and talk is a legitimate investigatory tactic when properly employed. *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). "[T]he purpose of a 'knock and talk' approach is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search." *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007). A knock and talk is reasonable when officers are "not convinced criminal activity [is] taking place nor [do] they have any reason to believe the occupants [are] armed." *Id.; see also, United States v. Jones*, 239 F.3d 716, 721 (5th Cir. 2001) (finding use of a knock and talk reasonable "[b]ecause the officers were not convinced that criminal activity was taking place and did not have any reason to believe that the occupants were armed").

the first residence and discovered evidence that the residence was used as a stash house. *Id.* Given the close proximity of the residences, officers became concerned that their search and seizure of the first residence could alert suspects at the second residence. *Id.* at 499. The officers dispatched an agent to monitor the second residence and to report any unusual activity. *Id.* While monitoring the second residence, the agent became concerned that suspects might be moving evidence into a vehicle and preparing to flee. *Id.* The agent requested backup and, after it arrived, secured a suspect in front of the residence. *Id.* The officers proceeded into the residence where they performed a protective sweep and secured additional suspects. *Id.*

The Fifth Circuit found exigent circumstances justified the officers' entry into the residence and held the officers did not create them. *Id.* at 506. Although "[t]here [was] little doubt that exigent circumstances existed once the agents abandoned their covert surveillance of the [second] residence and arrested [the suspect] in the van that was parked in front of that residence," the panel's analysis focused on the officers' decision to discontinue surveillance because, once the open and obvious arrest was made, "the immediate warrantless entry of that house [was] a foregone conclusion." *Id.* at 501. Given the short period of time between searching the first residence and observing suspects at the second residence preparing to leave, the panel found there was insufficient time to obtain a search warrant. *Id.* at 502-03. It further found the officers' belief that the suspects were preparing to depart was reasonable and justified the decision to discontinue surveillance. *Id.* at 505. The suspects' unprovoked actions, rather than the officers' conduct, created the exigency. *Id.* at 506.

In *Watson*, 273 F.3d 599 (5th Cir. 2001), officers observed a suspect selling narcotics to a police informant. *Id.* at 601. Officers arrested the suspect on the porch of his house, detained other

8

individuals in the vicinity, and made a protective sweep of the house. *Id.* The officers testified they swept the house because they were concerned unknown individuals could destroy evidence or pose a threat to their safety. *Id.* at 603. Although the Fifth Circuit acknowledged "the factual basis for these concerns [was] disputable," it did not find the district court clearly erred in finding the sweep justifiable. *Id.*

Finally, in *Maldonado*, 472 F.3d 388 (5th Cir. 2006), officers sought to execute an arrest warrant. *Id.* at 391. Officers, knowing the suspect's phone number but not his location, arranged for an undercover agent to call the suspect and solicit a drug transaction. *Id.* The suspect directed the undercover agent to a trailer and instructed him to hurry because he would not remain there long. *Id.* Officers trailed the undercover agent to the trailer and conducted brief surveillance. *Id.* at 391-92. When the undercover agent honked his car's horn, the suspect exited the trailer and the officers swarmed to arrest him. *Id.* at 392. During the arrest, the trailer door quickly opened and closed. *Id.* Officers, in front of a trailer and with no adequate cover, executed a protective sweep of the trailer. *Id.* The Fifth Circuit found exigent circumstances given "the brief time available to conduct surveillance of the trailer, the exposure of the agents in the open area surrounding the trailer, the opening and closing of the trailer door during [the suspect's] arrest, and the reasonable expectation that weapons are present during drug transactions." *Id.* at 395. The panel also found the exigency was not created by the officers, but by the suspect's insistence that the meeting occur at a trailer located in an open area, his complaints about the undercover agent's delay in arriving, and by the second individual's opening and closing of the trailer door. *Id.* at 396-97.

In two cases, *United States v. Jones* and *United States v. Newman*, officers legitimately conducted knock and talks but exigent circumstances arose compelling the officers to perform

9

protective sweeps of residences. In both cases, officers did not have reason to believe criminal activity was occurring nor did they have reason to believe occupants in the residence may be armed. Therefore, their knock and talks were legitimate investigatory tactics. Exigent circumstances, arising only because of the actions of suspects, caused officers to transition from investigatory knock and talks to protective sweeps.

In *Jones*, officers were dispatched to investigate a complaint of illegal drug sales in an apartment building. 239 F.3d at 718. The officers decided to employ a knock and talk because they did not believe they had probable cause to obtain a warrant. *Id.* at 719. When the officers arrived at the door of the unit, they found the screen door closed but the solid door ajar. *Id.* Through the screen, the officers observed two individuals and a handgun resting on a table. *Id.* One of the officers entered the apartment and secured the firearm. *Id.* Although "the presence of a firearm alone does not create an exigency without reason to believe that a suspect is aware of police surveillance," the Fifth Circuit found the officers' warrantless search justified because the occupants of the apartment were aware of the officers presence. *Id.* at 720. The panel held "[a] firearm that is located a short distance from an occupant in a residence likely containing illegal narcotics presents an obvious safety risk to law enforcement officers." *Id.* The Fifth Circuit found the officers' decision to perform a knock and talk did not create the exigency, because they had not "observe[d] any criminal activity before approaching [the defendant's] apartment that would nullify the purpose of a 'knock and talk' investigation." *Id.* at 721. The defendant "caused the exigent circumstances by leaving the door open and a handgun in plain view to anyone standing outside." *Id.* at 721-22.

In *Newman*, officers were seeking to execute an arrest warrant. 472 F.3d at 235. After observing the suspect's rental car parked near a house he was known to frequent, officers began

10

conducting surveillance of the premises. *Id.* After two hours, officers decided to engage in a knock and talk to inquire if the suspect was present. *Id.* As the officers approached the residence, a man fled from the front door and tried to escape over a fence. *Id.* While some officers apprehended that individual, other officers approached the open front door and called out. *Id.* Without entering, officers near the front door heard movement, observed movement behind a curtain, and saw a video monitoring system showing the officers' positions. *Id.* Fearing for their safety, the officers performed a sweep of the residence. *Id.* at 235-36. The appellate court found, given the events that had just transpired, the officers reasonably believed hidden, armed residents potentially posed a threat to their safety. *Id.* at 237-38. The panel further found the officers did not create the exigent circumstances by deciding to employ a knock and talk. *Id.* at 238-39. When the officers began the knock and talk to investigate whether the suspect was present, there was no immediate concern for officer safety. *Id.* The suspect's decision to abruptly flee the residence, in response to a legitimate police tactic, created the exigency. *Id.* at 239.

Finally, in three cases, *United States v. Munoz-Guerra*, *United States v. Vega*, and *United States v. Gomez-Moreno*, the Fifth Circuit found officers improperly conducted knock and talks thereby manufacturing exigent circumstances. In each case, officers had reason to suspect criminal activity or to fear occupants were armed. In each case, the Fifth Circuit found the officers' approaches manufactured exigency because, once the knock and talks were begun, protective sweeps were a foregone conclusion.

In *Munoz-Guerra*, 788 F.2d 295 (5th Cir. 1986), a tipster told officers a large quantity of drugs was stored at a certain condominium and that the occupant was armed. *Id.* at 296-97. The officers conducted covert surveillance and verified other details the tipster provided. *Id.* at 297. The

11

officers approached the residence for a closer look, observed through a window a small quantity of drugs and packaging for a scale, and knocked on the condominium's patio door. *Id.* The occupant responded to the officers' knocks but stated he could not unlock and open the patio door without getting a key from another room. *Id.* Fearing the occupant might destroy evidence or arm himself if he left their sight, the officers breached the patio door and performed a security sweep. *Id.* The Fifth Circuit found the officers "knew when they knocked on the patio door that, once having made their presence known to [the occupant] (and possibly to other occupants)[,] it would be necessary to conduct a security search of the premises and to restrain the condominium's inhabitants. Warrantless entry was thus a foregone conclusion the instant the agents revealed themselves to [the occupant] at the patio door." *Id.* at 298. The officers' decision to abandon surveillance and perform a knock and talk created exigent circumstances when nothing else demanded their approach. *Id.* at 298-99.

In *Vega*, 221 F.3d 789 (5th Cir. 2000), officers were advised armed individuals were planning to purchase a large quantity of narcotics. *Id.* at 793. Officers located the suspects car and followed it to a residence. *Id.* at 794. The officers did not have probable cause for a warrant, but decided to perform a knock and talk to request consent to search the residence. *Id.* After the officers knocked on the front door and announced themselves, a suspect fled through the back door and into an alley. *Id.* An officer guarding the rear of the residence heard movement inside and, fearing the occupants might dispose of evidence or barricade themselves, decided to perform a protective sweep. *Id.* The Fifth Circuit, concluding the officers created the exigency, found:

> The police here believed the suspects to be armed and in possession of easily-disposed-of illicit drugs. Yet, without justification, they abandoned their secure surveillance positions and took action they

> believed might give the suspects cause and opportunity to retrieve the weapons or dispose of the drugs. Their decision to take this action was not justified by an absence of time to secure a warrant or by any other reasonable predicate.

*Id.* at 799-800.

Finally, in *Gomez-Moreno*, officers were investigating a residence and a detached garage suspected of use by individuals transporting illegal immigrants. 479 F.3d at 352. The officers' surveillance lead them to believe the property was being used as a stash house where immigrants are held until a relative pays the smuggler's fee. *Id.* The officers decided to conduct a knock and talk to inquire whether illegal immigrants were present. *Id.* at 353. "When they knocked on the front door [of the residence], they received no answer, but they could hear people moving inside." *Id.* Officers at the garage also knocked, demanded entry, and received no answer, but heard individuals inside barricading the door. *Id.* "At about this time, a man exited the front house through a back door but stopped when he saw the officers" and ran back inside. *Id.* Officers pursued him into the house and performed a protective sweep. *Id.* The Fifth Circuit found the officers conduct exceeded the proper scope of a knock and talk:

> When no one answered [the officers' knocks], the officers should have ended the 'knock and talk' and changed their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance. Here, however, the officers made a show of force, demanded entrance, and raided the residence, all in the name of a 'knock and talk.' The officers' 'knock and talk' strategy was unreasonable, and accordingly, the officers created the exigent circumstances.

*Id.* at 355-56; *see also United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) (noting that, although a knock and talk is a reasonable investigative tool, "when no one answers the door, the

officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance" (internal quotations omitted)).

Aggregating these cases, the Court discerns some basic principles. If exigent circumstances exist before officers approach a residence, officers may enter the residence and perform a warrantless search. *See Maldonado*, 472 F.3d at 397 (finding officers' approach and sweep of residence justified by suspects' conduct); *Watson*, 273 F.3d at 603 (same); *Rico*, 51 F.3d at 506 (same). If exigent circumstances do not exist, officers may approach a residence to conduct an investigatory knock and talk. *Jones*, 239 F.3d at 720. A legitimate knock and talk does not include "impermissibly check[ing] the knob on [a] door," demanding entry, or making a show of force. *Gomez-Moreno*, 479 F.3d at 355-56. If, during the course of a legitimate knock and talk, a suspect's actions create exigent circumstances, officers may abandon their knock and talk and perform a warrantless entry and a protective sweep. *See Jones*, 239 F.3d at 721-22 (finding suspect's conduct, rather than the officers' decision to conduct a knock and talk, created the exigency); *Newman*, 472 F.3d at 238-39 (same). Finally, the decision to perform a knock and talk will be held responsible for creating exigency where circumstances are such that the knock and talk will necessarily entail a warrantless entry and protective sweep. *See Munoz-Guerra*, 788 F.2d at 298 (finding officers' knock and talk created exigent circumstances where a "warrantless entry was [] a foregone conclusion"); *Vega*, 221 F.3d at 800 (finding officers created exigency when they "took action they believed might give the suspects cause and opportunity to" threaten the safety of the officers or to destroy evidence).

Turning to the present case, the Court finds that if exigent circumstances existed, the exigency was caused by the officers' conduct. Despite somewhat contradictory testimony,[4] the Court credits the officers' belief they were in danger when positioned on Defendant's property. *See Rico*, 51 F.3d at 501 (finding it reasonable to believe officers were in danger when standing in front yard and residence's occupants were thought to be armed). Based on the officers' testimony, however, the Court fails to find any conduct or actions on the part of individuals on Defendant's property that prompted the officers' decision to approach the residence. *Compare id.* at 505-06 (finding suspects' actions created exigent circumstances justifying officers' approach of residence) *with Vega*, 221 F.3d at 800 (finding officers' approach of residence not justified "by an absence of time to secure warrant or by any other reasonable predicate"); *Munoz-Guerra*, 788 F.2d at 298 (finding officers' unprovoked approach of residence created exigent circumstances). Rather, the officers' approach into a dangerous situation without a warrant was without a reasonable predicate. Moreover, with the tip as to Creson's whereabouts coming early in the afternoon on a weekday, officers had the opportunity to obtain a warrant prior to approaching the house. *Compare Menchaca-Castruita*, 587 F.3d at 294 (finding "'the amount of time necessary to obtain a warrant' likely would be minimal, as the incident took place early on a weekday afternoon - as opposed to late in the evening or on a

---

[4] Although officers testified they feared for their safety because Creson had a reputation for carrying firearms, Agent Keener and Officer Wingo testified they would not have entered Defendant's residence if the rear door had been locked. APR. 5 HR'G TR. at 5; APR. 5 HR'G TR. at 50. Agent Keener and Officer Wingo's testimony and all the officers' conduct, collectively, somewhat belies the Government's position that the officers were at risk when positioned on the front lawn of Defendant's residence. If officers believe they are at risk from an armed individual inside a residence, the Court would expect officers to enter the residence and perform a sweep whether or not a door is locked. Similarly, the Court would expect officers to perform sweeps of the other outbuildings, including the shed where Creson was expected to be hiding, but would not expect officers to peer in windows or assemble in an unprotected parking area to discuss their next move. Finally, Officer Linder's affidavit in support of the warrant to search Defendant's property described the officers' motivation for entering the residence as "[d]ue to having a felony warrant for Creson and information that Creson was at the residence." Nevertheless, the Court finds the officers' belief they were in danger reasonable and accepts their conclusion. As will be explained, however, this danger was caused by the decision to approach the residence.

weekend when officers might not have had ready access to a magistrate") *with Rico*, 51 F.3d at 503 (concluding officers approach was reasonable because there was inadequate time to obtain a warrant). There appears to have been no reason why surveillance could not have been conducted while another officer quickly obtained a warrant. Indeed, the officers were able to obtain a warrant for Defendant's residence within two hours of executing the initial warrantless search, s*ee* DEF.'S MOT. at EX. 1, and, as Officer Wingo testified,[5] the risk to the officers would not have increased had they waited for the warrant. *See Munoz-Guerra*, 788 F.2d at 298 (finding "no basis, on these facts, for believing that resort to a magistrate would have created risks of a greater magnitude than these, which are present in any case where the police has probable cause but delay pending receipt of a warrant").

The Court finds speculative the Government's argument that waiting to obtain a warrant could have allowed Creson to evade police. Although there was ample evidence that Creson had repeatedly evaded officers, including early that morning, there was no testimony suggesting Creson believed officers knew his location and were planning to apprehend him. On the contrary, Creson had successfully escaped to Defendant's property, hidden his vehicle from view from the road, and was hunkered down inside Defendant's shed. Had officers delayed to obtain a warrant, there is no reason to suspect Creson would not have remained where he was. Moreover, the nature of Defendant's property would have made further evasion difficult. Defendant's residence, located at the end of a street and in the middle of a large clearing that provided sight lines from the surrounding woods, was amenable to covert surveillance. *See id.* (determining officers could have easily continued covert surveillance of residence located at end of street and observable from great

---

[5] *See* APR. 1 HR'G TR. at 121; APR. 5 HR'G TR. at 9.

distances). "[T]he risk that a criminal suspect will become aware of covert surveillance is deemed insignificant in contrast to the more substantial benefits we all derive from the procedural safe guards of judicial process." *Id.* at 299.

Finally, the officers' decision to conduct a knock and talk was unreasonable given their concerns for their safety.[6] Officers cannot rely on exigent circumstances to justify a warrantless search of a residence if the exigency and protective sweep were made necessary by their decision to approach the residence. *See Rico*, 51 F.3d at 503 (describing such a situation as "a classic example of a police-manufactured exigency"). The officers testified they were concerned for their safety as soon as they positioned themselves on Defendant's property within close proximity of his residence and outbuildings. APR. 1 HR'G TR. at 83. As in *Vega* and *Munoz-Guerra*, the officers here "took action they believed might give the suspect cause and opportunity" to threaten their safety. *Vega*, 221 F.3d at 800; *see also Munoz-Guerra*, 788 F.2d at 298 (finding officers created the exigency by approaching residence under circumstances that were likely to necessitate a protective search). The officers' decision to approach the residence made the immediate warrantless search of the residence a foregone conclusion. *See Munoz-Guerra*, 788 F.2d at 298.

Given the totality of the circumstances, the Court is compelled to conclude the officers' decision to approach Defendant's property created the exigency. The law is clear; "[t]he exigencies

---

[6] If the officers were not concerned for their safety, a knock and talk may have been reasonable. When the officers received no response, however, they should have cautiously retreated and sought a search warrant or conducted further survelliance. *See Gomez-Moreno*, 479 F.3d at 356; *Troop*, 514 F.3d at 410. The Government suggests the officers may not have been in danger until they realized the rear door of the trailer was unlocked because this could have indicated Creson had moved to the trailer. This conclusion is highly speculative, particularly given the door to the shed was securely locked. Furthermore, the Court is concerned the officer's act of checking the door knob may itself have constituted a search, and therefore could not provide justification for warrantless entry into the trailer. *See Gomez-Moreno*, 479 F.3d at 355 (characterizing the officers "check[ing] the knob on the door to the front house to determine if it would open" as "impermissibl[e]").

supporting a warrantless search may not . . . 'consist of the likely consequences of the government's own actions or inaction.'" *Jones*, 239 F.3d at 719 (quoting *Vega*, 221 F.3d at 799). Officers cannot knowingly place themselves at risk and then rely on that risk to justify a warrantless search. *Munoz-Guerra*, 788 F.2d at 298; *cf. Newman*, 472 F.3d at 238-39 (finding knock and talk appropriate where there was no immediate concern for officer safety). Accordingly, the Court finds the exigent circumstances exception to the warrant requirement is inapplicable in this case. Therefore, the Court recommends granting Defendant's motion to suppress.

## **CONCLUSION**

For the foregoing reasons, the Court recommends Defendant's motion be **GRANTED**.

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

**So ORDERED and SIGNED this 13th day of April, 2010.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE